**COMSHARE, INC., Plaintiff–Appellant,**

v.

**UNITED STATES of America,
Defendant–Appellee.**

No. 92–1310.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 16, 1992.

Decided June 27, 1994.

Stephen D. Winter (argued and briefed), Kathleen McCree Lewis, Sherrill D. Wolford (briefed), Dykema & Gossett, Detroit, MI, for plaintiff-appellant.

Stephen J. Markman, U.S. Atty., Office of the U.S. Atty., Detroit, MI, Gerald H. Parshall, Trial Atty., U.S. Dept. of Justice, Tax Div., Gary R. Allen, Acting Chief (briefed), Nancy G. Morgan (argued), Bruce R. Ellisen, Charles Bricken, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, DC, Elizabeth Larin, Asst. U.S. Atty., Detroit, MI, for U.S.

Before: NELSON and BOGGS, Circuit Judges; and ROSENN, Senior Circuit Judge.*

DAVID A. NELSON, Circuit Judge.

Plaintiff Comshare, Inc., a computer software company, sued the government to obtain a refund of federal income taxes. During the tax years in question the company had spent several million dollars to purchase computer program source codes embodied in magnetic tapes and discs. The company used these master source code tapes and discs to manufacture software products for its customers. The question we are asked to decide is whether the district court erred in holding, as it did on cross-motions for summary judgment, that the master source code tapes and discs did not constitute "tangible" property the purchase of which entitled the company to investment tax credits and accelerated depreciation deductions calculated on the basis of the full investment. (Under the applicable tax law, only investments in tangible property could qualify for the favorable tax treatment; investments in intangibles did not qualify.)

Although the master tapes and discs purchased by Comshare were tangible, the information they contained was not. Without the encoded information, the tapes and discs would have cost only a minuscule fraction of the price the company actually paid. Yet without the tapes and discs, the record establishes, there would have been no sale. The

* The Honorable Max Rosenn, Senior Circuit Judge      for the Third Circuit, sitting by designation.

company would have paid nothing if the seller had been unable to deliver the source codes on tapes or discs. The value of the source codes was thus entirely dependent upon the existence of tapes and discs.

Where the value of information is dependent upon its having been embodied in a tangible medium, case law from other circuits teaches, acquisition of the medium at a price that includes the value of the information encoded on it constitutes acquisition of "tangible" property the full cost of which qualifies for the tax benefits associated with such property. The government has given us no persuasive reason to depart from this teaching, and we shall therefore reverse the judgment of the district court.

I

Plaintiff Comshare produces software (magnetically encoded discs and tapes) that the company's customers use either on a timesharing basis or in their own computers. This software embodies computer instructions known in the jargon of the trade as "executable code." When a software product incorporating executable code is plugged into a computer, the computer is instantly given the brainpower, as it were, to perform the tasks the software was designed to enable it to perform.

In manufacturing its software products, Comshare uses master source code tapes and discs purchased from others. In fiscal year 1982 Comshare purchased tapes and discs embodying four such source codes. The cost was approximately $3.5 million. An additional $750,000, approximately, was expended on a similar purchase in fiscal year 1983. The prices paid by Comshare covered not only the master source code discs and tapes, but associated know-how, copyrights, licenses, manuals, and rights to modify, reproduce, and distribute. No specific portion of the price paid by Comshare was allocated to the intellectual property rights included in the purchase, and the record shows that those rights would have had no value without the master source code tapes and discs themselves.

An affidavit describing the development of one of the source codes in question ("System W") explains that as many as 20 people devoted more than 100,000 hours to the development of that source code. Working at computer terminals connected to a single large computer, and using structure charts for general guidance, individual programmers created separate pieces of the source code by direct input into the computer system. No one programmer knew what all the other programmers were doing, and no one programmer could retain even his own work product in his head.

The tangible result of this massive effort was a master computer tape longer than a football field. A single inch of the tape would contain more than 1,600 individual magnetic characters. Comshare's chief financial officer, T. Wallace Wrathall, personally took possession of the master tape from the vendor in England, brought the tape back to the United States, and delivered it to the director of Comshare's data center in Ann Arbor, Michigan. (It is in Ann Arbor that Comshare makes the software products used by its customers.)

An affidavit executed by an expert witness for the government suggested that computer programs such as System W could have been transmitted by telephone, without any tapes or discs having changed hands. Comshare countered this affidavit with a declaration in which Peter Gray, the director of the Ann Arbor data center during the years in question, attested that "[t]hroughout this period affordable communication technology did not have sufficient capacity or reliability to distribute large commercial software products such as Comshare's." Mr. Gray's declaration went on to say that "[i]f this technology had been practically feasible, the software nonetheless would have had to exist in tangible form to begin with and Comshare would have required tangible masters for testing and the reproduction process...."

An affidavit given by Robert Feldman, corporate counsel for Comshare since 1978, stated unequivocally that:

"If the seller of any of the software involved in this case had been unable to deliver the source code on tapes or discs,

Comshare would not have completed the sale. If the only copy of the source code on tapes or discs was destroyed before it could be duplicated, there would be nothing from which the executable code which is sold or licensed to customers could be created.

\*     \*     \*

"If the only physical copy of the source code had been destroyed, the accompanying copyright rights would have been worthless to Comshare."

The government made no attempt to refute these statements.

The source code on the master tapes and discs was never released to Comshare's customers. Through the use of compilers or similar devices, rather, the source code was converted by stages into executable code; from a master copy of the executable code, Comshare then made duplicates for distribution to its customers. The source code was routinely enhanced to create new versions of executable code; the master source code tapes and discs were indispensable to this process and to the process of "debugging" the executable code software. Executable code could not be enhanced, and it could not be used to recreate the source code from which it was derived.

## II

During the period that concerns us here, the tax code granted two types of advantageous treatment for investments in tangible personal property used in a trade or business. The first was the investment tax credit, introduced originally by the Revenue Act of 1962. Under the Revenue Act, statutorily-specified percentages of qualified investments in tangible personal property could be offset against taxes otherwise due. See former §§ 38, 46 and 48 of the Internal Revenue Code, codified at the corresponding sections of Title 26 of the United States Code.[1] The second type of advantageous treatment was rapid depreciation prescribed by the accelerated cost recovery system (ACRS) introduced by the Economic Recovery Tax Act of 1981. See 26 U.S.C. § 168. Subject to cer-

tain exceptions, this system provided for depreciation of "any tangible property" over a shorter period of time than that permitted under traditional depreciation methods, thereby increasing the depreciation deductions available early in the life of the property.

Comshare took ACRS depreciation deductions for the master source code tapes purchased in 1982 and 1983. The Internal Revenue Service disallowed the deductions, maintaining that only straight line depreciation was allowable. The difference in the amount of tax due came to about $40,000. After paying the full amount in issue, Comshare presented a refund claim. Six months elapsed without action on the claim, and in April of 1990 Comshare commenced its refund suit in the United States District Court for the Eastern District of Michigan.

Comshare was not in a position to utilize investment tax credits on the master source code tapes in 1982 and 1983, but we are given to understand that the company would have been able to carry forward credits totaling about $425,000 if the IRS had acknowledged that the master tapes qualified for the investment tax credit as "tangible personal property." Resolution of the tangibility question for depreciation purposes will presumably be dispositive of the question for purposes of the investment tax credit as well.

About a year after the lawsuit was filed, the government moved for summary judgment on the ground that as a matter of law computer software is not tangible property. Comshare responded with its own motion for summary judgment, contending that the undisputed facts demonstrated that the master tapes and discs at issue here were indeed tangible property. The matter was referred to a magistrate judge who, after oral argument, issued a report and recommendation concluding that the tangibility question should be decided in favor of the government. The district judge issued an order accepting the report and recommendation, granting the government's summary judgment motion and denying Comshare's mo-

---

1. The intangible tax credit was repealed in 1969,     reinstated in 1971, and repealed again in 1985.

tion. Comshare then perfected a timely appeal.

### III

At the most basic level, it is indisputable that the computer tapes and discs purchased by Comshare were tangible. When Comshare's Mr. Wrathall picked up the System W master tape in London, he was not acquiring information that someone whispered in his ear; he was acquiring a physical artifact that could be touched by the human hand. The tape was every bit as tangible as the famous stone kicked by Dr. Johnson in refuting Bishop Berkeley. The tape purchased by Comshare was far more valuable than a blank tape would have been, however, thanks to the magnetic source code developed over many months by the team of people working at their computer terminals in England. And not even the sensitive fingers of a safe-cracker or a reader of braille could distinguish between the encoded tape—the value of which was measured in the millions—and a blank tape worth no more than one or two hundred dollars. The source code had a tangible home, but was not itself tangible. The intellectual property rights acquired by Comshare were likewise intangible, of course.

Reasoning that the intrinsic value of the encoded tape was attributable almost entirely to its intangible elements, the government maintains that the property must be deemed intangible for tax purposes. Comshare, on the other hand, reasons that the source code and the rights acquired with it would have been valueless if the seller had not been able to deliver the code in tangible form; therefore, says Comshare, the property must be deemed tangible for tax purposes. The statute contains no direct guidance on how this debate should be decided. The drafters of the tax code assumed that the word "tangible" would be self-explanatory, and they provided no statutory test for distinguishing that which is tangible from that which is not.

The structure of the statutory provisions does suggest, however, that "tangible property" was viewed as a broad category rather than a narrow one. This generalization holds true both for ACRS and the investment tax credit.[2]

In establishing the accelerated cost recovery system, Congress said that the depreciation deduction for property used in a trade or business should be determined under ACRS for "*any* tangible property," except as otherwise provided in the pertinent section of the statute. 26 U.S.C. § 168 (emphasis supplied). The list of exceptions includes motion picture film and videotape (which may still qualify for the investment tax credit, as we shall see), but does not include computer tape or computer discs. Neither does the list create a generic exception for tangible property the value of which has been substantially enhanced by intangible factors. That Congress chose to provide favorable treatment for "any" tangible property not specifically excluded, rather than limiting such treatment to types of tangible property specifically named, thus seems significant.

In providing for the investment tax credit, similarly, Congress extended the credit to tangible personal property in general, subject only to specified exceptions that have no application here. See former 26 U.S.C. § 48. The legislative history of the 1962 statute confirms that "all" tangible personal property was intended to be covered, except for the specified exclusions. S.Rep. No. 1881, 87th Cong., 2d Sess., reprinted in 1962 U.S.Code Cong. & Admin.News 3297, 3318.

More important, perhaps, is the purpose that Congress sought to achieve in passing the investment tax credit legislation. President Kennedy had proposed such a measure in a message sent to Congress in April of

---

**2.** The corresponding category in the Uniform Commercial Code likewise has a broad sweep. Under the provisions of the Code that apply to "transactions in goods," the term "goods" is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." U.C.C. § 2–105(1). Courts and academic commentators have been moving toward the position that computer software is a "good" covered by the sales provisions of the Code, and not simply an intellectual property right which is not covered. See *Advent Systems Ltd. v. Unisys Corp.,* 925 F.2d 670, 673–76 (3d Cir.1991), and the authorities there cited.

1961, and in testimony before the Senate Finance Committee his Secretary of the Treasury had urged adoption of the proposal in order to help strengthen economic recovery, attain a higher rate of growth in the economy, and sustain full employment. *Id.* at 3313. The Finance Committee was receptive to this plea, explaining that the investment tax credit would "stimulate investment ... by reducing the net cost of acquiring depreciable assets"[3] and by "increasing the flow of cash available for investment...." *Id.* at 3314. (Increased cash flow would be particularly important, the committee noted, "for new and smaller firms [a category that would now undoubtedly include many software firms] which do not have ready access to the capital markets." *Id.*) In short, "[t]he objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country...." *Id.*

Although some had suggested that tax changes designed to enhance consumer demand would be the appropriate way to raise the level of investment in productive assets, the committee was unwilling to look only to the demand side: "[T]o rely only on such an approach suggests primarily expansion of existing kinds of equipment and techniques, rather than more efficient and larger quantities of capital per worker and therefore greater productivity." *Id.* To encourage investment in new and more efficient techniques and equipment, of course, would be to encourage precisely the kinds of investments Comshare was making in 1982 and 1983.

Given the legislative purpose spelled out in the committee report, it is worth emphasizing that however exotic Comshare's computer tapes and discs would have appeared in earlier times, these tapes and discs were production tools indistinguishable in function from the tools that have always been found in the workshops of the world. And the fact that the raw materials from which these particular tools were made had been enhanced in value by the incorporation of coded information hardly makes the tapes and discs unique. The dies from which the ancient Romans struck their coins, the models used in casting bronze, the templates used only yesterday (and perhaps still used) in fashioning boats and cars, all embodied "information" that shaped the end product. It was human thought and effort that gave the older tools their intrinsic value, just as it was human thought and effort that gave Comshare's tapes and discs their intrinsic value—and in each case, the tools were tangible capital assets created to improve efficiency in production.

Congress may not have realized, in 1962, what an enormous potential for improved efficiency lay in the new kinds of equipment and technologies the Revenue Act was designed to encourage, but it was clearly hoped that the economy would benefit from the innovations that the administration and the Congress were trying to promote in the private sector. In keeping with this effort, the committee report explicitly stated that "[t]angible personal property is not intended to be defined narrowly here...." *Id.* at 3318.[4]

The principle that "tangible personal property" has an expansive meaning, not a narrow one, was endorsed by the Senate Finance Committee when the investment tax credit was reinstated in 1971—and this time the endorsement was given in a factual setting not unlike the one presented here. In 1962, when the investment tax credit first became effective, Walt Disney Productions had invested about $1.5 million in creating motion picture film negatives used in making the positive prints that were distributed to exhibitors for viewing by the public. The IRS acknowledged that Disney's master films constituted depreciable assets, but disallowed an investment tax credit on the ground that Disney's investment was mainly

---

**3.** The IRS has acknowledged that the computer tapes and discs in question here were depreciable assets.

**4.** The immediate context of the quoted statement suggests that the authors of the report were thinking about the distinction between personal property and real property. In the broader context of the report as a whole, however, there is no reason at all to suppose that "tangible personal property" was intended to be defined narrowly in *any* respect.

an investment in intangibles. A federal district court in California ruled against the IRS, and in favor of Disney, on the central issue presented:

> "The motion picture negatives here certainly are tangible—weighing between.27 and 51 pounds, between 5000 and 11,800 feet in length and capable of being seen and touched. [Footnote omitted.] The negatives are physically used in the manufacture of prints which are plaintiff's stock in trade to its customers. It is this use which establishes the eligibility as 'tangible personal property'." *Walt Disney Productions v. United States*, 327 F.Supp. 189, 192 (C.D.Cal.1971).

Soon thereafter the Senate Finance Committee, in a report on the legislation reinstituting the investment tax credit, explicitly said that the district court had got it right: "The committee agrees with the court that motion picture and TV films are tangible personal property eligible for the investment credit." S.Rep. No. 92–437, 92nd Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Admin.News 1825, 1918, 1941. And if film negatives used to make positive prints of movies can qualify as tangible personal property, it is not readily apparent to us why computer tapes used to make copies of executable code software cannot qualify as well.

The decision in *Disney* was appealed to the Court of Appeals for the Ninth Circuit. That court, like the Senate Finance Committee, agreed with the district court. *Walt Disney Productions v. United States*, 480 F.2d 66 (9th Cir.1973), *cert. denied*, 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). As the district court had done, the court of appeals held that a Treasury regulation on which the IRS had relied was invalid insofar as it would have allocated to intangibles all of the costs of production of the negative except for the negligible cost of the raw film; the regulation, said the court of appeals, "is plainly inconsistent with the expressed purpose of the applicable statute as shown by the legislative history." *Id.* at 68.[5] To attribute all of Disney's labor and production costs to intangibles, the court of appeals continued, would defeat the purpose of the credit:

> "For example, the same regulation, if applied to a production machine in an automobile factory, would deny the investment credit on all but the material costs of a machine developed and patented for use in the manufacturing plant although the amount paid to the inventor for the idea of the machine was insignificant and the bulk of the costs of the machine were the ordinary labor and engineering costs of its production. Disney argues that its film negatives, like the hypothetical production machines, are standardized units of depreciable property which Disney uses to produce other products, the positive prints, and that the attribution of all the value of the film to the copyright, like the attribution of all the value of a machine used in production to a patent eventually procured on it, is unwarranted. We agree." *Id.*[6]

A case involving Disney's right to an investment tax credit for master negatives created in 1970 came before the Ninth Circuit some years later. Again the court held that master negatives are tangible property the cost of which can be used to obtain the credit:

> "The master negatives for each film title are used by Disney as a capital asset to create exhibition prints for rental or sale.

**5.** The regulation in question, Treas.Reg. 1.48–1, defined "tangible personal property" in terms that excluded "[i]ntangible property, such as patents, copyrights and subscription lists...." The cost of purchasing or producing a patented or copyrighted item would not qualify for the investment tax credit, the regulation went on to say—even if the item were tangible—and "in the case of a motion picture or television film or tape, the cost of the intangible property includes manuscript and screenplay costs, the costs of wardrobe and set design, the salaries of cameramen, actors, directors, etc., and all other costs properly includable in the basis of such film or tape."

**6.** Although the Tax Reform Act of 1976 refined the manner in which the investment tax credit was applied to movie and television films, that act and its legislative history continued to reflect the "basic assumption ... that motion pictures and television films qualify for the credit." *Bing Crosby Productions, Inc. v. United States*, 588 F.2d 1293, 1297 (9th Cir.1979). The 1976 legislation made no change that has any bearing on the case before us here.

Most of the value of the exhibition prints rests on the right of exclusive exploitation protected by copyright, but that fact does not render the capital asset (the master negatives) an intangible. A machine which stamps out patented products for sale is tangible. The character of the acquisition costs of that machine is not affected by the character of the end product, even if the value of the entire system is dependent on the patent, *i.e.*, an intangible." *Walt Disney Productions v. United States*, 549 F.2d 576, 581 (9th Cir.1976).

By the time the Ninth Circuit issued its opinion with respect to Disney's 1970 films, a district court in Texas had decided an unrelated case—*Texas Instruments, Inc. v. United States*, 407 F.Supp. 1326 (N.D.Tex.1976)— in a manner that seemed inconsistent with the earlier *Disney* cases. *Texas Instruments* did not involve motion picture film; like the case at bar, it involved the applicability of the investment tax credit and ACRS depreciation to magnetic computer tapes that had been encoded with costly information and that were used by the taxpayer in producing information-bearing products for distribution to its customers. (The taxpayer in *Texas Instruments* collected and processed seismic information by inducing sound into the ground and capturing reflected vibrations on computer tapes. Through an editing process that sharpened the field tape signals, the taxpayer developed "output" tapes and analog films that were used to produce pictures, in cross-section, of the earth's crust. The pictures were employed by the taxpayer's customers in exploring for oil and gas.) The taxpayer claimed that it was entitled to investment credits and accelerated depreciation deductions based on the total capitalized costs of the encoded computer tapes. Agreeing with the IRS that the taxpayer was really investing in the information collected on the tapes, and was only incidentally investing in reels of virgin computer tape, the district court rejected the taxpayer's claim on the

ground that no significant investment had been made in tangible property.

In its opinion on the 1970 Disney films, the Ninth Circuit recognized that while the district court's decision in *Texas Instruments* could be distinguished on its facts, the decision was "not compatible" with *Disney I*. See 549 F.2d at 581. Adhering to the views it had adopted earlier, and declining to follow the district court decision in *Texas Instruments*, the Ninth Circuit expressed the belief "that we are more nearly following the expressed intent of Congress if we treat the property before us in this case … as tangible property for investment tax credit purposes." *Id.* at 581–82.

The Fifth Circuit ultimately agreed; on appeal to that court, the district court decision in *Texas Instruments* was reversed. *Texas Instruments, Inc. v. United States*, 551 F.2d 599 (5th Cir.1977). The Fifth Circuit accepted the reasoning of the Ninth Circuit's *Disney* cases.[7] And in rejecting the government's arguments, the Fifth Circuit added a refinement that is highly pertinent to the matter before us here:

"The government's arguments, plausible as they may sound, simply refuse to recognize that the value of the seismic data is entirely dependent upon existence of the tapes and film. If the tapes and film were destroyed prior to any reproduction of the film analog, nothing would remain. An investment in the data simply does not exist without recording of the data on tangible property. Thus the basis of the tangible tapes and films must include the costs of collecting seismic … data and recording it on the tangible property, with the result being an asset constituting 'tangible personal property.'

"The statute admits of no other construction on the facts of this case. The ordinary and customary meaning of 'tangible' is that which can be felt by touch, having actual form and substance. Webster's New Twentieth Century Dictionary

---

7. The Fifth Circuit's *Texas Instruments* decision, in turn, was cited with approval by the Ninth Circuit in *Bing Crosby Productions, Inc. v. United States*, 588 F.2d 1293, 1298 (9th Cir.1979), where master negatives of motion pictures were

again held to qualify for the investment tax credit, and in *EMI North America Holdings, Inc. v. United States*, 675 F.2d 1068 (9th Cir.1982) (master sound tapes held to qualify for the credit).

1863 (unabridged 2d ed.1964). The seismic data tapes and films are admitted by the government to be tangible. They have intrinsic value because the seismic information thereon does not exist as property separate from the physical manifestation. The seismic data tapes and films are tangible personal property used by [the taxpayer] in its business of producing copies for sale. The entire cost of producing such tapes and films must be included in the basis upon which investment tax credit should be allowed." *Id.* at 611.

Unless the Fifth Circuit's reasoning is somehow flawed, *Texas Instruments* would appear to be dispositive of the issue presented in the case at bar.

When the present case was argued before the district court, the government expressed the view that the Fifth Circuit's *Texas Instruments* decision "misapplied" an "intrinsic value test" that had been proposed by the government there. The government does not go this far in its argument on appeal; it argues instead that *Texas Instruments* is distinguishable because the "inextricable connection" that existed between the intangible information and the tangible tapes in *Texas Instruments* is not replicated here. The government further argues that *Texas Instruments* is distinguishable because the information encoded on the computer tapes and analog film at issue there pertained to physical events—sound waves reverberating through the earth's crusts—whereas the information encoded on the computer tapes at issue here records only the thought processes of the people who developed the master source code.

We find neither of these arguments persuasive. Sound waves and brain waves are about equally incorporeal, it seems to us— and the connection between the information and the medium embodying it is no less inextricable in this case than it was in *Texas Instruments,* or, for that matter, in the *Disney* cases.

There may, it is true, be a disputed issue of fact in this case as to whether it would have been feasible for Comshare's vendor to link its computer to Comshare's computer by telephone and create duplicates of the vendor's tapes and discs through that connection. It is undisputed, however, that Comshare would not have purchased the source code or the rights associated with the copyright if the code could not somehow have been captured on tapes or discs usable by Comshare. Physical tapes and discs were essential to Comshare's manufacturing process, the affidavits establish, and it simply does not matter whether Comshare could have obtained encoded discs and tapes by telephone as opposed to manual delivery. What matters, under *Texas Instruments,* is that the value of the source code and the associated intangible rights was entirely dependent upon the existence of the tapes and discs.

In *Bank of Vermont v. Savings Realty, Inc.,* 88–1 U.S.T.C. (CCH) 83,247 (D.Vt.1988), one of two lower court cases on which the government relies heavily here, a federal district court held that computer software purchased by the plaintiff bank constituted intangible property not eligible for the investment tax credit. Notwithstanding that the computer programs were encoded on magnetic tape, the district court thought that "the intangible information ... [was] not necessarily dependent upon the tangible medium...." *Id.* at 83,250. The court distinguished *Texas Instruments* on the ground that "[t]he nexus between the intangible information and the tangible medium is far more attenuated in this action than in *Texas Instruments.*" *Id.* The district court distinguished *Disney* on the following ground:

> "The intangible information on film cannot exist without the tangible medium of the film tape. The ideas and the medium are inextricably connected. This connection does not exist between a computer program and the medium on which it is stored." *Id.*

As we have seen, however, the record in the case at bar shows without contradiction that the intangible information on Comshare's master source code tapes and discs could not exist in usable form without the tangible medium. The ideas and the medium were, in fact, inextricably connected here.

The *Bank of Vermont* decision thus fails to persuade us not to follow *Texas Instruments* in this case.

*Ronnen v. Commissioner of Internal Revenue*, 90 T.C. 74, 1988 WL 2748 (1988), the other case on which the government relies heavily, arose out of the purchase (by an S Corporation tax shelter in which the plaintiff was an investor) of a computer software package designed to assist nursing homes with the completion of complex governmental report forms. The package included computer tapes—but not the master tape, which was retained by the vendor—and the Tax Court acknowledged that "software must be tangible to be used by a computer. . . ." *Id.* at 97 n. 6. Stressing that the encoded information was capable of being transferred from one medium to another, however, the Tax Court held that the software was intangible and thus not eligible for the investment tax credit. *Id.* at 100.

The Tax Court found the *Disney* line of cases inapplicable because, among other things, the Ninth Circuit had placed so much emphasis on the character of the master motion picture films as capital assets used to create products for rental or sale. The software purchased by the taxpayer in *Ronnen*, by contrast, "was not a 'capital asset' used to create copies. In fact," the Tax Court continued, the *Ronnen* taxpayer "was not in possession of the master tape." *Id.* at 98.

Comshare, unlike the *Ronnen* taxpayer, was in possession of the master tapes. And Comshare, unlike the taxpayer in *Ronnen*, used the tapes as capital assets to create products for its customers, just as the production companies did in *Disney* and its progeny. Insofar as this aspect of the case is concerned, *Ronnen*'s discussion of the *Disney* cases provides more support for Comshare than for the government.

Turning to *Texas Instruments*, the *Ronnen* court noted that the Fifth Circuit had "found that the information placed on the tangible disks and tapes was tangible personal property because the seismic data did not exist as property separate from the physical manifestation." *Id.* at 99. The test of tangibility applied by the Fifth Circuit was, in the words of that court, whether "the value of the . . . data was totally dependent upon the existence of the tapes and films." *Id.* Purporting to apply the same test to the facts of the case before it, the *Ronnen* court concluded simply that "the intrinsic value of the [taxpayer's] software is attributable to its intangible elements rather than to its tangible embodiments." *Id.* at 99–100.

We express no view as to whether the Fifth Circuit's "totally dependent" test was applied correctly in *Ronnen*. If the same test is applied to the facts of record here, however, it seems clear to us that the property acquired by Comshare was no less tangible than the property acquired by the taxpayer in *Texas Instruments*. It is true that the information on Comshare's tapes and discs could be transferred to other tapes and discs, but that was true as well of the information on the tapes and discs in *Texas Instruments*. In this case, as in that one, the critically important fact is that the taxpayer's investment could not be put to productive use, and would thus be worthless, unless the information were embodied on tapes and discs accessible to the taxpayer.

The legislative history of the statute that reinstituted the investment tax credit in 1971 includes statements by the cognizant committees that the measure was designed, among other things, to "provide a rational system of tax incentives to aid in the modernization of our productive facilities." S.Rep. No. 92–437, 92nd Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Admin.News 1918. The productive facilities used by Comshare in creating software for its customers happened to involve computer tapes embodying source code that can be transferred from one tape to another. It would simply not be rational for Congress to say to Comshare "we will provide tax incentives to help you acquire new and improved master source code tapes for use in making your software products, but the incentives will be withheld if the source code can be transferred from one tape to another." If we take at face value the statement by the congressional committees that the legislation was designed to provide a "rational" system of tax incentives, we think that the credits and deductions claimed by Comshare must be allowed.

To affirm the district court's denial of the credits and deductions, it seems to us, would be to abandon the course already charted by two of our sister circuits. We see no good reason to create any such split of authority, and several good reasons not to. The judgment of the district court is therefore **RE-VERSED,** and the case is **REMANDED** with instructions to enter summary judgment in favor of plaintiff Comshare.