108 T.C. No. 18

UNITED STATES TAX COURT

NORWEST CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13908-92.                    Filed April 30, 1997.


     P purchased operating and applications software
for use in its banking and related businesses.  The
software was acquired subject to license agreements
that entitled P to use the software on a nonexclusive,
nontransferable basis for an indefinite or perpetual
term.  P did not purchase any exclusive copyright
rights or other intellectual property rights underlying
any of the software in issue and was not permitted to
reproduce the software outside P's affiliated group.
     <u>Held</u>:  The computer software acquired by P is
tangible personal property eligible for the investment
tax credit.  The intrinsic value test set forth in
<u>Texas Instruments, Inc. v. United States</u>, 551 F.2d 599
(5th Cir. 1977), and adopted by this Court in <u>Ronnen v.
Commissioner</u>, 90 T.C. 74 (1988), is not applied to the
computer software in issue.  The test of tangibility in
<u>Comshare, Inc. v. United States</u>, 27 F.3d 1142 (6th Cir.
1994), is not adopted.

Mark Hager, Robert J. Jones, and Susan K. Matlow, for petitioner.

Robert M. Ratchford and Robert M. Fowler, for respondent.

HALPERN, Judge:  Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1983 | $2,605,571 |
| 1984 | 2,442,134 |
| 1985 | 29,187 |
| 1986 | 19,301,530 |

Respondent also determined that the provision for increased interest under section 6621(c) applied for 1983, 1984, and 1986. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties and the continuation of other issues, the sole issue for decision is whether certain computer software expenditures made by petitioner during the years in issue qualify for the investment tax credit.  Resolution of that issue depends on the characterization of the acquired software as either tangible or intangible property, as only investments in tangible property are eligible for the investment tax credit.  We conclude that the acquired software is tangible personal property eligible for the investment tax credit.

## FINDINGS OF FACT[1]

Background

Petitioner is a group of affiliated corporations (the Norwest affiliated group) that provides banking and other financial services. Petitioner files consolidated Federal income tax returns. At the time the petition was filed, petitioner's principal place of business was located in Minneapolis, Minnesota.

Petitioner extensively uses computers in processing data and in providing essential accounting and other business functions. During the years in issue, petitioner utilized three types of computer systems: (1) large-scale "mainframe" computers, which were used to process large amounts of data and transactions at a central location, (2) minicomputers, which were typically used to process self-contained single business applications, such as processing transactions from automated teller machines (ATMs) or controlling the work stations that tellers use to process transactions in a bank, and (3) personal computers (PCs), which were generally smaller stand-alone devices used for word-processing and spread-sheet applications.

Each of the above-described computer systems requires operating software (also called systems software) and

---

[1] The stipulation of facts and accompanying exhibits are incorporated herein by this reference. The trial Judge made the following Findings of Fact, which we adopt.

applications software to enable the computer to function and perform specific tasks. Operating software is used to manage the operations of a computer; it schedules and controls jobs, keeps track of the placement and storage of information, manages traffic, and generally enables a computer to process a particular application. Applications software provides specific business functions like accounting, transaction processing, calculating interest, and producing customer statements. Petitioner purchased both operating and applications software during the years in issue.

Software enables a computer to function and perform specific tasks by providing instructions, or commands, to the computer system. The instructions are written in a programming language, or source code, understandable to humans, such as COBOL (Common Business Oriented Language) or FORTRAN (Formula and Translation code). The source code is written, line by line, by programmers in accordance with the overall design of the computer program and the specific tasks a computer is to perform.[2] A completed computer program may contain hundreds of thousands of lines of source code and is eligible for copyright protection.

A compiler is used to convert source code into a machine-readable computer language, known as executable, or object, code.

---

[2] Typically, a substantial portion of the time used in developing a computer program is spent in the design phase, with considerably less time spent on programming (typing or "keying in") the lines of source code.

Executable code is composed of sequences of binary digits (zeros and ones). Each digit is called a "bit", and eight-bit sequences are called "bytes".[3] A computer program can be written onto a magnetic disk or tape by encoding its particular executable code on the surface of the disk or tape.[4] That magnetic recording allows the computer processor to read the executable code and to perform the specific tasks directed by the code.

Generally, the cost of a blank tape, similar to one upon which the computer programs acquired by petitioner were placed, was less than $25 during the years in issue. An encoded computer program can easily be transferred or copied onto additional blank tapes and disks, resulting in identical reproductions of the program. A computer program can also reside on media other than magnetic tapes and disks, such as punch cards and CD-ROMs

---

[3] For example, in the American Standard Code for Information Interchange (ASCII), the binary representation for the letter "A" is 01000001, and the binary representation for the letter "Z" is 01011010.

[4] The surface of the computer disk or tape is magnetically encoded with the executable code by magnetizing the crystals or particles in the recording medium corresponding to the sequence of zeros and ones making up the binary system of executable code. For example, under the "nonreturn to zero inverted" (NRZI) encoding method, every zero is represented on the disk or tape by a magnet pointing in a certain direction, and every one by a magnet pointing in the opposite direction. The amount of information contained on a disk or tape is a function of the magnetic recording density of the disk or tape. The information on the disk or tape is interpreted by the computer when the magnetic bits are converted into electrical signals.

(compact disk read-only memory).[5] Moreover, computer programs can be received preinstalled on a computer's hard disk drive (internal storage device) and can be transferred from one computer to another via electronic transmission over telephone lines without the use of intervening tapes and disks. Although telephonic transmission was technologically possible during the years in issue, it was slow and unreliable and, therefore, was not a feasible method of transferring a large computer program. All of the software in issue was delivered to petitioner as computer programs encoded on magnetic tapes and disks. The software was purchased separately from computer hardware.

Petitioner's Software Expenditures

All of the software expenditures in issue were for software developed by third parties and sold to members of the Norwest affiliated group for use in their banking and financial services operations. The software was either of a type available to the general public or a specialized type of software used by financial institutions like petitioner. The software was sold subject to license agreements that entitled petitioner to use the software on a nonexclusive, nontransferable basis for an indefinite or perpetual term. Petitioner did not purchase any exclusive copyright rights or other intellectual property rights

---

[5]     Although CD-ROM technology had been developed, it was not widely used as a means of distributing software during the years in issue. Further, during the years in issue, punch cards had become obsolete.

underlying any of the software in issue; petitioner did not purchase the right to reproduce such software outside the Norwest affiliated group.

All mainframe software purchased by petitioner during the years in issue consisted of computer programs encoded on magnetic tape (for large applications, on several reels of tape) and was either shipped or personally delivered by a service representative to petitioner's mainframe site. Each computer program was loaded (copied from the magnetic tape) onto the mainframe computer's own storage medium, known as a "disk pack". The computer program would then be tested and modified, as necessary, over a period of several weeks or months. Modifications were made, for example, to change the layout of a screen, to add or revise reports, or to conform the title of a field to normal usage in petitioner's business operations.[6] After the computer program was installed, petitioner retained the original tape or an exact copy in case a problem occurred that required the program to be reloaded onto the mainframe computer.[7] Typically, one copy was kept on site for immediate access, and a

---

[6] In some cases, the computer program source code (or a portion of it) was made available to petitioner to assist in making the desired modifications and in correcting program errors. In those instances, however, petitioner was not entitled to reproduce the source code for use outside the Norwest affiliated group.

[7] Pursuant to the license agreements, petitioner was typically permitted to make a limited number of backup copies of each computer program for emergency purposes only.

second copy was kept off site as a second backup to the on-site copy in the event of a disaster.[8]

Petitioner typically entered into a maintenance and support agreement with the vendor (usually for an additional periodic fee) in conjunction with the purchase of mainframe or minicomputer software whereby the vendor agreed to correct errors in the computer program and to provide updated versions of the software as they became available. If a copy of software had been lost or destroyed (and a backup had not been made), a replacement copy would have been provided to petitioner by the vendor without charge.

Petitioner was entitled to only one running version of each copy of software purchased. Thus, if petitioner desired to load a copy of software onto a second computer (which it did), additional copies had to be purchased (sometimes at reduced rates) or a multiple-machine license was required.

---

[8] The installation process was essentially the same for minicomputer software. A computer program would be received on magnetic tape, loaded onto the minicomputer, and tested for errors before being put into service. Additionally, both on-site and off-site backup copies were maintained. Computer programs for personal computers (PCs) were received on small diskettes (floppy disks) and loaded onto the PC's hard disk drive. Because PC software is significantly cheaper and easier to replace, petitioner did not make backup copies of PC software for off-site storage.

OPINION

I.   Introduction

     A.   Issue

Petitioner purchased during the years in issue operating and applications software for use in its banking and financial services businesses.  The software was acquired subject to license agreements that entitled petitioner to use the software on a nonexclusive, nontransferable basis for an indefinite or perpetual term.  Petitioner did not purchase any exclusive copyright rights or other intellectual property rights underlying any of the software in issue and was not permitted to reproduce the software outside the Norwest affiliated group.  The sole issue for decision is whether petitioner's software expenditures qualify for the investment tax credit (ITC).  Resolution of that issue depends on the characterization of the acquired software as either tangible or intangible property.  We conclude that the acquired software is tangible personal property eligible for the investment tax credit.

     B.   Arguments of the Parties

Petitioner contends that the computer software it purchased during the years in issue constitutes tangible personal property eligible for the investment tax credit under section 38. Petitioner's position stems from its interpretation of the "intrinsic value" test first enunciated by the Court of Appeals for the Fifth Circuit (the Fifth Circuit) in Texas Instruments,

Inc. v. United States, 551 F.2d 599 (5th Cir. 1977). We adopted the intrinsic value test in Ronnen v. Commissioner, 90 T.C. 74 (1988), and held that the computer software in issue in that case was intangible property for purposes of the ITC. Petitioner argues that Ronnen and its progeny are distinguishable from the present case and finds support for its position that computer software is tangible personal property in a more recent decision of the Court of Appeals for the Sixth Circuit (the Sixth Circuit), Comshare, Inc. v. United States, 27 F.3d 1142 (6th Cir. 1994). In Comshare, the court adopted an interpretation of the intrinsic value test seemingly different from our own and held that a computer program's master source code embodied in magnetic tapes and disks constituted tangible personal property for purposes of the ITC. Petitioner argues that the rationale in Comshare is the better one as it stems from and is supported by the approach of the Fifth Circuit in Texas Instruments and by the approach of the Court of Appeals for the Ninth Circuit (the Ninth Circuit) in a series of cases holding that certain master sound recordings and motion picture negatives were tangible personal property eligible for the investment tax credit (Disney line of cases). See EMI N. Am. Holdings, Inc. v. United States, 675 F.2d 1068 (9th Cir. 1982); Bing Crosby Prods., Inc. v. United States, 588 F.2d 1293 (9th Cir. 1979); Walt Disney Prods. v. United States, 549 F.2d 576 (9th Cir. 1976); Walt Disney Prods. v. United States, 480 F.2d 66 (9th Cir. 1973).

In addition to relying on the cases cited above, petitioner contends that computer software should be eligible for the investment tax credit for the following reasons: (1) Congress did not intend the term "tangible personal property" to be defined narrowly; (2) the Commissioner has held in Rev. Rul. 71-177, 1971-1 C.B. 5, that software acquired in conjunction with the purchase of a new computer is eligible for the ITC; (3) the Commissioner's treatment of software as "export property" pursuant to other Code provisions supports a finding that software is tangible personal property; and (4) software is treated as tangible property upon which sales and use taxes may be imposed under the laws of a majority of the States.

Respondent contends that computer software is intangible property and that our holdings to that effect in Ronnen v. Commissioner, supra, and its progeny are applicable herein. Respondent also argues that Comshare, Inc. v. United States, supra, was incorrectly decided or, alternatively, that Comshare, as well as the Fifth and Ninth Circuit decisions relied upon by petitioner, are distinguishable from the present case. Lastly, respondent disagrees with petitioner's interpretation of and reliance on the additional authorities mentioned above.

## II. Analysis

### A. Code and Regulations

Section 38 allows the investment tax credit. The ITC is calculated as a specified percentage of the taxpayer's investment

in "section 38 property" placed in service during the taxable year. Section 48(a) defines "section 38 property" as including, among other things, "tangible personal property". The term "tangible personal property" is not defined in the statute. Section 1.48-1(c), Income Tax Regs., however, states that "the term 'tangible personal property' means any tangible property except land and improvements thereto". Section 1.48-1(f), Income Tax Regs., states that "[i]ntangible property, such as patents, copyrights, and subscription lists, does not qualify as section 38 property." In sum, the relevant statutory provisions and regulations thereunder provide limited guidance in determining the characterization of operating and applications software for purposes of the ITC.

B.   Case Law

The Fifth Circuit in Texas Instruments, Inc. v. United States, supra at 611, held that seismic data tapes and film "have intrinsic value because the seismic information thereon does not exist as property separate from the physical manifestation" and, therefore, were tangible personal property for purposes of the ITC. A subsidiary of Texas Instruments, Inc. (GSID), was in the business of collecting, processing, and selling or licensing seismic information to customers engaged in oil and gas exploration. Id. at 608. GSID's customers were furnished with pictures derived from a complicated collection and editing process that depicted the contours of the earth's different

strata.  Id.  The Fifth Circuit described that process as follows:

> The method used in collecting the seismic data needed to produce such pictures was to introduce sound into the ground and then capture the various reflected vibrations from the subterrain in microphone-like receivers.  Those receivers then transmitted the electronic impulses to recording stations where the impulses were transcribed onto magnetic computer tapes known as "field" tapes.  From there the impulses recorded on the field tapes were taken to a processing center where background noise or signals were eliminated.  With the retained or primary signals sharpened by the editing process, a "final" or "output" tape was produced.  Using a computer, the information contained on the output tapes as electronic impulses was then transformed into a picture representing a vertical slice of the earth.  The computers through which the field tapes were processed are digital computers and the reflex signal data were placed on the output tapes in digital form.  [Id.]

The Fifth Circuit explained its holding as follows:

> [T]he value of the seismic data is entirely dependent upon existence of the tapes and film.  If the tapes and film were destroyed prior to any reproduction of the film analog, nothing would remain.  An investment in the data simply does not exist without recording of the data on tangible property.  Thus the basis of the tangible tapes and films must include the costs of collecting seismic * * * data and recording it on the tangible property, with the result being an asset constituting "tangible personal property."  [Id. at 611.]

This Court in Ronnen v. Commissioner, 90 T.C. 74 (1988), adopted the so-called intrinsic value test created by the Fifth Circuit in Texas Instruments, Inc. v. United States, 551 F.2d 599 (5th Cir. 1977).  In Ronnen, the taxpayers were principal shareholders of an S corporation, HSL, formed to purchase the rights to a computer software package designed to assist nursing

homes with regulatory reporting requirements.  See Ronnen v. Commissioner, supra at 75-77.  The corporation received, among other things, copies of the computer program and the right to commercially exploit the program in a particular territory.  See id. at 82-83.  The master source tape was held by the seller for security reasons and was available to HSL on an as-needed basis. Id. at 83.

This Court found inapplicable the series of cases in the Ninth Circuit holding that certain master sound recordings and motion picture negatives were tangible personal property eligible for the ITC.  We distinguished the master negatives in the Disney line of cases by stating, "HSL's software was not a 'capital asset' used to create copies.  In fact, HSL was not in possession of the master tape."  Id. at 98.  This Court then turned to the Fifth Circuit's analysis in Texas Instruments, Inc. v. United States, supra.  This Court stated:

> The Internal Revenue Service took the position that the investment was in the cost of the intangible, the seismic data, and not in the tangible films and tapes.  The Fifth Circuit interpreted the Internal Revenue Service's argument to suggest "that property is intangible if its intrinsic value is attributable to its intangible elements rather than to any of its specific tangible embodiments."  Based on this "intrisic value" [sic] test, the court held that the taxpayer's investment in the information was an investment in tangible property because "the value of the seismic data was totally dependent upon the existence of the tapes and films.  If the tapes and film were destroyed prior to any reproduction, nothing would remain.  An investment in the data simply does not exist without recording of the data on tangible property."  In looking at the property's "intrinsic

value," the court found that the information placed on the tangible disks and tapes was tangible personal property because the seismic data did not exist as property separate from the physical manifestation. * * * [Ronnen v. Commissioner, supra at 99; citations omitted.]

After presenting the Fifth Circuit's explanation of its holding in Texas Instruments, Inc. v. United States, supra, this Court simply stated:  "We apply the 'intrinsic value' test adopted by Texas Instruments to the facts of this case to conclude that the intrinsic value of the HSL software is attributable to its intangible elements rather than to its tangible embodiments."  Ronnen v. Commissioner, supra at 99-100. This Court held that the computer software in issue was intangible and, thus, ineligible for the ITC.  Id. at 100.  We have since followed Ronnen on numerous occasions and have held that computer software is intangible property for purposes of the ITC.  See, e.g., Kansas City S. Indus., Inc. v. Commissioner, 98 T.C. 242, 262-264 (1992); Gantner v. Commissioner, 91 T.C. 713, 728 (1988), affd. on other grounds 905 F.2d 241 (8th Cir. 1990).

More recently in Comshare, Inc. v. United States, 27 F.3d 1142 (6th Cir. 1994), the Sixth Circuit held that a computer program's master source code embodied in magnetic tapes and disks constituted tangible personal property for purposes of the ITC. The taxpayer in Comshare purchased tapes and disks embodying master source codes and the "associated know-how, copyrights, licenses, manuals, and rights to modify, reproduce, and

distribute." Id. at 1143. The source code was converted into executable code, and from a master copy of the executable code, duplicates (executable code software) were distributed to Comshare's customers. Id. at 1144.

First, the Sixth Circuit, citing the statutory language, acknowledged that Congress extended the ITC to tangible personal property in general, subject only to specified exceptions inapplicable to the case at bar. Id. at 1145. The court noted that the legislative history supported a broad interpretation of the term "tangible personal property". Id. Considering the legislative purpose in enacting the ITC, the Sixth Circuit believed that Congress intended "to encourage precisely the kinds of investments" made by Comshare in acquiring the master source codes. Id. at 1146.

The Sixth Circuit then analyzed the line of cases beginning with Walt Disney Prods. v. United States, 327 F. Supp. 189 (C.D. Cal. 1971). The court could not distinguish film negatives used to make positive prints of movies from computer tapes used to make copies of executable code software. The Sixth Circuit then considered Texas Instruments, Inc. v. United States, supra, and considered "highly pertinent" the language quoted above relating to the intrinsic value test. Comshare, Inc. v. United States, supra at 1148. The court stated that "[u]nless the Fifth Circuit's reasoning is somehow flawed, Texas Instruments would

appear to be dispositive of the issue presented in the case at bar." Id. at 1149.

In disposing of the Government's argument that the "inextricable connection" between the intangible information and the tangible tapes in Texas Instruments, Inc. v. United States, supra, was not replicated in Comshare, Inc. v. United States, supra, and that "sound waves reverberating through the earth's crusts" are distinguishable from the "thought processes of the people who developed the master source code", the Sixth Circuit stated:

> We find neither of these arguments persuasive. Sound waves and brain waves are about equally incorporeal, it seems to us--and the connection between the information and the medium embodying it is no less inextricable in this case than it was in Texas Instruments, or, for that matter, in the Disney cases. [Id. at 1149.]

The court believed that "[w]hat matters, under Texas Instruments, is that the value of the source code and the associated intangible rights was entirely dependent upon the existence of the tapes and discs." Id. In addition, the Sixth Circuit was not persuaded by the assertion in Bank of Vermont v. United States, 61 AFTR 2d 88-788, 88-1 USTC par. 9169 (D. Vt. 1988), that a computer program is not inextricably connected to the medium on which it is stored.

The court in Bank of Vermont held that computer software consisting of application programs stored on magnetic tapes was intangible property and, therefore, ineligible for the ITC. Id.

at 88-792, 88-1 USTC par. 9169, at 83,251.  That court

distinguished Texas Instruments, Inc. v. United States, 551 F.2d

599 (5th Cir. 1977), in the following manner:

> [T]he intangible information (seismic data) and the
> tangible medium (magnetic tape) were inextricably
> connected.  The former could not exist without the
> latter.  In the present action, the intangible
> information (the software) is not necessarily dependent
> upon the tangible medium (the magnetic computer tapes).
> The application programs exist on paper and conceivably
> in the mind of the programmer as well.  The placement
> of the program on the tape, facilitates the sale of the
> program--it is not, however, the only way that the
> program can exist.  The computer tape functions merely
> as one type of conduit for the ideas contained on it.
> The nexus between the intangible information and the
> tangible medium is far more attenuated in this action
> than in Texas Instruments.  [Bank of Vermont v. United
> States, 61 AFTR 2d at 88-790, 88-1 USTC par. 9169, at
> 83,250.]

The Sixth Circuit in Comshare, Inc. v. United States, supra,

explicitly rejected that distinction, finding it to be contrary

to the facts in Comshare, and stated that the ideas and the

medium in the case at bar were inextricably connected because the

"master source code tapes and discs could not exist in usable

form without the tangible medium."  Id. at 1149.

The Sixth Circuit also addressed our opinion in Ronnen v.

Commissioner, 90 T.C. 74 (1988).  The court stated that the

discussion in Ronnen regarding the Disney line of cases supported

Comshare's position because Comshare used the master source code

tapes and disks as capital assets to create products for its

customers, whereas the corporation in Ronnen did not purchase a

capital asset used to create copies or possess the master source

tape.  Comshare, Inc. v. United States, 27 F.3d at 1150.  Turning

to this Court's application of the test of tangibility set forth

in Texas Instruments, Inc. v. United States, supra, the Sixth

Circuit stated:

> We express no view as to whether the Fifth
> Circuit's "totally dependent" test was applied
> correctly in Ronnen.  If the same test is applied to
> the facts of record here, however, it seems clear to us
> that the property acquired by Comshare was no less
> tangible than the property acquired by the taxpayer in
> Texas Instruments. * * * the critically important fact
> is that the taxpayer's investment could not be put to
> productive use, and would thus be worthless, unless the
> information were embodied on tapes and discs accessible
> to the taxpayer.  [Comshare, Inc. v. United States,
> supra at 1150.]

The court concluded that Comshare was entitled to an investment

tax credit on the total cost of the master source codes and

associated intellectual property rights.

C.    Examining the Distinction Between Seismic Data and a
      Computer Program

This Court in Ronnen v. Commissioner, supra, applied the

intrinsic value test set forth in Texas Instruments, Inc. v.

United States, supra, and held that the computer software in

issue in that case was intangible property for purposes of the

ITC.  We did so without making either a rigorous analysis of the

rationale underlying that test or a detailed comparison of the

computer software in issue and the seismic data tapes and film in

Texas Instruments, Inc. v. United States, supra.  This Court

determined, implicitly, that the intangible component of the

property in issue, the computer program, existed as property

separate and apart from its physical manifestation, the tapes. In other words, by holding that the computer software in issue was intangible property, this Court concluded that the inextricable connection between the seismic data and the tapes and film in Texas Instruments, Inc. v. United States, supra, does not exist between a computer program and its tangible residences. In Comshare, Inc. v. United States, 27 F.3d 1142 (6th Cir. 1994), the Sixth Circuit found no significant distinction between sound waves and brain waves in relation to the physical embodiment of any resulting information. The analysis made by the Sixth Circuit brings into question the distinction relied on by us in Ronnen v. Commissioner, supra, and prompts us to reexamine the basis for that distinction.

For the purposes of applying the intrinsic value test as interpreted by this Court, there is no fundamental difference between seismic data and a computer program. Seismic data theoretically exists in the geologic features of the subterrain in the same way that a computer program theoretically exists in the mind of its creator. Similar to a computer program, seismic data may exist in various forms and occupy numerous tangible residences in that it can be embodied in field tapes, output tapes, analog film, or even seismic pictures. The compilation of both types of information requires human exertion.

Those who see a distinction between seismic data and a computer program may contend that the fundamental difference

between the two types of information is that a compilation of seismic data is an original recording of physical events that could never be perfectly reproduced; in other words, it is a particular rendition of human exertion, whereas numerous renditions of human exertion in writing a computer program could result in identical source codes. That distinction, however, is illusory. First, the fact that seismic data may differ each time the same subterrain is bombarded with sound waves is relevant only if differences in the data create material changes to the seismic pictures that would be purchased by oil and gas explorers. It seems unlikely that changes in geologic features, which generally occur over long periods of time, qualitatively affect the nature of the corresponding seismic data. Second, even if the seismic picture of an unchanging feature would be different because of changes in the recording and editing process, it is still theoretically possible to disregard those different processes and to reproduce a materially indistinguishable seismic picture, just as it would be theoretically possible to disregard different programming languages and to rewrite a computer program in the language used to create the original source code. The essential point is that there is no material distinction in the theoretical duplicability of the human exertion required to gather both types of information.

Those who see a distinction between seismic data and a computer program may also assert that, although the inextricable connection between both types of information to its respective tangible residences may be analogous, seismic data does not exist as property apart from its physical manifestation, whereas a computer program does exist as property apart from the disks and tapes upon which it resides.  In other words, the argument is that if the seismic data tapes and film are destroyed prior to reproduction, nothing remains, but if the only copy of a computer program's source code that has not yet been converted to executable code is destroyed, the computer program still exists as intellectual property.  First, that assertion fails to recognize a basic condition of copyright protection, that a work must be fixed in a "tangible medium of expression"; ideas alone are not protected.  See 17 U.S.C. sec. 102 (1994).  In addition, the coexistence of two distinct property interests, the right to a specific copy of a computer program and the copyright underlying that computer program, should not affect the tangible or intangible character of either.  In any event, there is no principled distinction between seismic data and a computer program in terms of the existence of either as property apart from its physical manifestation.

In sum, seismic data embodied in field tapes as electronic impulses are analogous to a computer program embodied in tapes and disks as a master source code written in COBOL, FORTRAN, or

any other programming language. Thus, operating and applications software, which is the product of converting a source code by means of a compiler into configurations of machine-readable computer language known as executable code, is analogous to the output tapes that were produced from the field tapes using a digital computer. See <u>Texas Instruments, Inc. v. United States</u>, 551 F.2d at 608 ("the impulses recorded on the field tapes were taken to a processing center where background noise or signals were eliminated. With the retained or primary signals sharpened by the editing process, a 'final' or 'output' tape was produced."). Essentially, for the purposes of applying the intrinsic value test as interpreted by this Court, the seismic data were as inextricably bound to the field and output tapes in <u>Texas Instruments, Inc. v. United States</u>, 551 F.2d 599 (5th Cir. 1977), as the master source codes were to the tapes and disks in <u>Comshare, Inc. v. United States</u>, 27 F.3d 1142 (6th Cir. 1994), and the configurations of executable code are to the tapes and disks in the present case.

D.  <u>Weakness of the Intrinsic Value Test</u>

Application of this Court's interpretation of the intrinsic value test to the facts in <u>Texas Instruments</u>, <u>Comshare</u>, and the present case does not produce meaningful distinctions that justify differential treatment for purposes of the ITC. Indeed, our interpretation of the intrinsic value test calls into question the Fifth Circuit's application of the very test it

created.  If a materially indistinct copy of the seismic data tapes and film could be reproduced from another pass over the relevant portion of the earth's surface, this Court would assert that the intrinsic value of the property is in the seismic data and not in the tapes and film, contrary to the Fifth Circuit's conclusion.  That discrepancy exists because this Court, under the rationale of Ronnen v. Commissioner, 90 T.C. 74 (1988), and its progeny, would likely focus on the theoretical duplicability of the seismic data tapes and film in determining whether the seismic data exists as property separate and apart from its physical manifestation, whereas the Fifth Circuit would focus on the nonexistence as property of the particular seismic data in the absence of a recording of that data on some tangible medium.

In addition, the Sixth Circuit's interpretation of the test of tangibility created by the Fifth Circuit in Texas Instruments, Inc. v. United States, supra, referred to as the "totally dependent" test in Comshare, Inc. v. United States, supra, may lead to anomalous results.  By focusing on whether a taxpayer's investment can be put to productive use in the absence of the tangible medium, the Sixth Circuit's approach would conceivably characterize both the information underlying a complex patent that could only be conveyed to and used by a purchaser if embodied in some tangible medium and the associated intellectual property rights of that patent as tangible personal property for purposes of the ITC.  Arguably, however, that result would be

different under the Sixth Circuit's test if the Government could prove that the information underlying the complex patent could be transferred via electronic transmission over telephone lines and that the purchaser could use the information in that form without receiving a disk, tape, or document.  We believe that the characterization of property for purposes of the ITC should not depend on the capacity or reliability of "affordable communications technology" at the time of transfer.  Cf. Comshare, Inc. v. United States, supra at 1143-1144 (suggesting the contrary conclusion).

In sum, it is reasonable to state that the Fifth Circuit's test of tangibility set forth in Texas Instruments, Inc. v. United States, supra, as interpreted either by this Court or the Sixth Circuit, leads to questionable conclusions in some instances.  In addition, our conclusion in Ronnen v. Commissioner, supra, and its progeny that computer software is intangible property is inconsistent with the Sixth Circuit's conclusion that a master source code embodied in magnetic tapes and disks is tangible property.  Those divergent applications of the Fifth Circuit's test indicate that there does not exist one universally applied intrinsic value test; indeed, the courts have not even settled on a name for the Fifth Circuit's test.  Instead of attempting to refine or reformulate the Fifth Circuit's test, we believe that resolution of the issue before the Court should

begin with the term "tangible personal property" and end with an examination of the legislative history of the ITC.

     E.    A Traditional Approach

Petitioner acquired operating and applications software that was subject to license agreements entitling petitioner to use the software on a nonexclusive, nontransferable basis for an indefinite or perpetual term.  Petitioner did not purchase any exclusive copyright rights or other intellectual property rights underlying any of the software in issue and was not permitted to reproduce the software outside the Norwest affiliated group.  We must determine whether the software acquired by petitioner constitutes tangible personal property for purposes of the ITC.

As an initial matter, the relevant statutory provisions and regulations thereunder provide limited guidance and do not resolve the issue of whether the term "tangible personal property" includes operating and applications software.  The Revenue Act of 1962, Pub. L. 87-834, sec. 2, 76 Stat. 962, first enacted the investment tax credit.  S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 703, is the report of the Committee on Finance that accompanied H.R. 10650, which became the Revenue Act of 1962.  S. Rept. 1881, supra, 1962-3 C.B. at 722, stated that, except for specified exclusions, "all tangible personal property qualifies as section 38 property.  * * *  Tangible personal

property is not intended to be defined narrowly here".[9]  That explicit legislative intent to define broadly the term "tangible personal property" suggests that the term may encompass all personal property that is not intangible property in the narrow, traditional sense; i.e., rights and obligations created by law. Cf. Goldman, Comment, "From Gaius to Gates:  Can Civilian Concepts Survive the Age of Technology?", 42 Loy. L. Rev. 147, 166 (1996) (defining incorporeals as legal rights and obligations, and corporeals as that which is not incorporeal).

Intangible intellectual property rights and the tangible or physical manifestations or embodiments of those rights are distinct property interests.  See, e.g., 17 U.S.C. sec. 202 (1994) (ownership of copyright distinct from ownership of any material object in which work is embodied).  A purchaser of a particular tangible manifestation or embodiment of intellectual property acquires only property rights in that manifestation or embodiment and does not acquire any rights to the underlying intellectual property.  In this case, petitioner acquired copyrighted articles and did not acquire any of the underlying, exclusive copyright rights.  Cf. sec. 1.861-18, Proposed Income

---

[9]     Some have suggested that the expansive definition of the term "tangible personal property" applies only in relation to fixtures or other items regarded as real property for certain purposes under local law because the examples presented in S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 703, 722, address such property.  The examples illustrate the adjective "personal" in the term "tangible personal property" and do not foreclose a broad interpretation of the adjective "tangible".

Tax Regs., 61 Fed. Reg. 58152 (Nov. 13, 1996) (proposed regulations that distinguish between a copyrighted article and a copyright right in clarifying the treatment under certain provisions of the Code and tax treaties of income from transactions involving computer programs).  In light of the legislative directive to construe the term "tangible personal property" broadly and "[t]he objective of the investment credit * * * to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country", S. Rept. 1881, supra, 1962-3 C.B. at 717, we believe that petitioner's acquisition of the operating and applications software without any associated, exclusive, intangible intellectual property rights is precisely the type of investment Congress intended to encourage in enacting the ITC. Therefore, the computer software acquired by petitioner constitutes tangible personal property eligible for the ITC.

Although we have not relied here on a consideration of intrinsic value, we do not necessarily disagree with the conclusion in Ronnen v. Commissioner, 90 T.C. 74 (1988), that the software acquisition in issue in that case was ineligible for the ITC.  It must be remembered that the corporation in that case received more than a limited license to use a copy of the tapes; the corporation received the right to commercially exploit the tapes in a particular territory.  That suggests the acquisition of copyrightlike rights.  Lastly, we did not make an inquiry into

the nature of the taxpayer's ownership rights with respect to the software items in issue in both <u>Kansas City S. Indus., Inc. v. Commissioner</u>, 98 T.C. 242 (1992), and <u>Gantner v. Commissioner</u>, 91 T.C. 713 (1988), because we relied on <u>Ronnen</u>.  Those cases also must be read in light of the analysis we adopt today.

III.    <u>Conclusion</u>

Petitioner's software expenditures during the years in issue qualify for the ITC.

<u>An appropriate order</u>

<u>will be issued</u>.

Reviewed by the Court.

SWIFT, WELLS, RUWE, WHALEN, COLVIN, BEGHE, VASQUEZ, and GALE, <u>JJ</u>., agree with this majority opinion.

CHIECHI, <u>J</u>., did not participate in the consideration of this opinion.

FOLEY, J., concurring in result only: I agree with the majority's holding. Specifically, I agree that our analysis should focus on the nature of the rights petitioner acquired. I do not agree, however, with two aspects of the majority's opinion. The majority's examination in part II.C of "the Distinction Between Seismic Data and a Computer Program" is unpersuasive. Majority op. p. 20. Moreover, this analysis is unnecessary under the new approach adopted by the majority, which focuses on the underlying property rights in, rather than the physical characteristics of, the asset acquired. In addition, the legislative history accompanying the investment tax credit does not support the majority's assertion in part II.E that petitioner's acquisition of software is "precisely the type of investment Congress intended to encourage in enacting the ITC." Majority op. p. 29. This is an unfounded statement of congressional prescience rather than congressional intent. The legislative history relied on by the majority related to the original enactment of the ITC in 1962. At that time, Congress probably did not foresee the myriad of technological innovations relating to computer software. Therefore, the legislative history accompanying the ITC provides minimal, if any, guidance in determining whether petitioner's purchase qualifies for the credit.

I agree with the majority that "resolution of the issue before the Court should begin with the term 'tangible personal

property' and end with an examination of the legislative history of the ITC."  Majority op. p. 26.  In the absence of legislative guidance on this issue, it is reasonable and appropriate to analyze the nature of the rights petitioner acquired and conclude that petitioner's software qualifies for the ITC as tangible personal property.

PARR, J., agrees with this concurring in result only opinion.

JACOBS, <u>J</u>., dissenting:  The majority ruling today overturns this Court's firmly established jurisprudence by holding that computer software is tangible personal property, eligible for the investment tax credit.  I believe the majority is wrong; therefore, I dissent.[1]

I.  Preliminary Matters

A.  Software's Encoded Information Is Intellectual Property, Which Is Intangible

Preliminarily, computer software possesses both tangible and intangible characteristics. Computer programs like the ones in issue are configurations of executable code that instruct a computer to process data in a specified manner.  The encoded information is intangible property; the computer tapes and disks on which the information is embodied is tangible property. <u>Comshare, Inc. v. United States</u>, 27 F.3d 1142, 1145 (6th Cir. 1994). Although a program may be perfectly reproduced onto numerous tangible residences, the program itself is inherently intellectual property. And intellectual property is intangible property.

B.  Purchaser of Software Only Interested in Using the Intellectual Property Contained on Tapes and Disks

When one acquires computer software, the item desired is the intellectual property stored on the tangible disk or tape, i.e., the computer program, not the disk or tape itself.  See <u>Bank of</u>

---

[1]   I was the trial Judge in this case.  The majority opinion adopted my findings of fact.  The adopted findings of fact are accurate.

<u>Vermont v. United States</u>, 61 AFTR 2d 88-788, 88-1 USTC par. 9169 (D. Vt. 1988). One would not pay thousands, or even tens of thousands of dollars, for the disk or tape without the software's intellectual property placed thereon.

The software here acquired was sold subject to nonexclusive, nontransferable license agreements. Pursuant to those agreements, petitioner was entitled to use the software it purchased in its banking and related activities but was not permitted to reproduce or resell the software to others. It is clear from the license agreements that petitioner was interested only in using the intangible programs contained on the tapes and disks. This point is demonstrated by the description provided in a license agreement entered into in conjunction with the purchase of "ESTIMATICS" software from Management and Computer Services, Inc.:

> The intangible knowledge, information and know-how to be made available hereunder shall be provided on 5 1/4" diskette for the IBM personal computer.

### C. A Computer Program Is Not Inextricably Bound to a Single Tangible Medium

Software's intellectual property is fluid. The intellectual property was placed on a tangible medium simply for ease of transmission. The initial housing of the intellectual property on a tangible medium is temporary, and ultimately, the program's intellectual property is mirror-image transferred onto a computer. And it is this mirror-image transfer that the purchaser of the computer software desires when acquiring the software. Upon the

subsequent transfer to the computer, the intellectual property becomes dually housed: (1) On the disk or tape, and (2) on the computer. Moreover, an unlimited number of mirror-image transfers of the computer program can occur; the computer program can even be mirror-image transferred from one disk or tape to another.

A computer program can be transferred electronically over telephone lines, although during the years in issue, telephonic transmission was slow and unreliable. A computer program can be erased from the disk or tape and typed in exactly anew by programmers from written documentation of the source code without destroying the underlying intellectual property. Clearly, a computer program is not inextricably bound to any single tangible medium.

II. Case Law

Beginning in 1988, this Court held in Ronnen v. Commissioner, 90 T.C. 74, that computer software is intangible personal property. We have steadfastly applied this characterization in other cases. See Kansas City S. Indus., Inc. v. Commissioner, 98 T.C. 242, 262 (1992); Alexander v. Commissioner, 95 T.C. 467, 470 (1990), affd. without published opinion sub nom. Stell v. Commissioner, 999 F.2d 544 (9th Cir. 1993); Gantner v. Commissioner, 91 T.C. 713, 728 (1988), affd. on other grounds 905 F.2d 241 (8th Cir. 1990); B.D. Morgan & Co. v. Commissioner, T.C. Memo. 1988-569; Smith v. Commissioner, T.C. Memo. 1988-420; Salzman v. Commissioner, T.C. Memo. 1988-86.

The Court of Appeals for the Sixth Circuit in <u>Comshare, Inc.</u> <u>v. United States</u>, <u>supra</u>, reached a result different from ours in <u>Ronnen</u> and its progeny. The court in <u>Comshare</u> held that tapes and disks containing computer program master source codes are tangible personal property; consequently, the purchaser of the tapes and disks was entitled to investment tax credits and accelerated depreciation deductions calculated on the full investment.

A discussion of the case law in this area is set forth in the majority opinion pp. 12-18; no useful purpose would be served by repeating it here.

III. Intrinsic Value Test

The intrinsic value test, which the majority criticizes, is a facts and circumstances test first enunciated by the U.S. Court of Appeals for the Fifth Circuit in <u>Texas Instruments, Inc. v. United</u> <u>States</u>, 551 F.2d 599 (5th Cir. 1977). In applying the intrinsic value test, one compares the investment in the intangible aspects of the property being characterized (here, the software program; in <u>Texas Instruments</u>, the seismic data) with the investment in the tangible embodiments (here, the tapes and disks; in <u>Texas</u> <u>Instruments</u>, the film and tapes). After making the comparison, if the property's "intrinsic value is attributable to its intangible elements rather than to any of its specific tangible embodiments", the property is considered intangible. <u>Id.</u> at 609.

We adopted the intrinsic value test in <u>Ronnen v. Commissioner</u>, <u>supra</u>, and held that computer software is intangible property

because "the intrinsic value of the * * * [taxpayer's] software is attributable to its intangible elements rather than to its tangible embodiments." Id. at 99-100. I believe this interpretation of law is correct; thus, I would continue to follow it, notwithstanding Comshare.

IV. Computer Software Is Different From Master Film Negatives and Seismic Data Tapes

As noted in Ronnen v. Commissioner, supra, and as it appears clear to me today, computer software is distinguishable from the master film negatives in Walt Disney Prods. v. United States, 480 F.2d 66 (9th Cir. 1973), and 549 F.2d 576 (9th Cir. 1976), and the seismic data tapes and films in Texas Instruments. In those cases, the tapes and films contained original recordings of physical events that could never be perfectly duplicated or repeated. As noted by the Court of Appeals for the Fifth Circuit in Texas Instruments, if the original recordings were destroyed prior to reproduction, the information stored thereon would also be lost. Because the seismic data recordings (in Texas Instruments) and the motion picture negatives (in Disney) could never be perfectly recreated if the originals were destroyed or lost, those courts held the intangible information was inextricably bound to its tangible medium. But as preliminarily noted, no such relationship exists between a computer program and the magnetic tape or disks upon which the computer program is stored.

The court in <u>Comshare, Inc. v. United States</u>, 27 F.3d 1142 (6th Cir. 1994), emphasized that the taxpayer therein would not have purchased the master source code unless it was on tapes or disks.  But the intrinsic value test is not dependent upon whether the property must appear on a tangible medium to be usable. Rather, the test rests upon whether the software exists separate and apart from the tangible tapes and disks.   Such an interpretation of the intrinsic value test is consistent with the Court of Appeals for the Fifth Circuit's application of that test in <u>Texas Instruments</u>.   See <u>Texas Instruments, Inc. v. United States</u>, <u>supra</u> at 611 ("the seismic information * * * [on the tapes and film] <u>does not exist</u> as property separate from the physical manifestation" (emphasis added)). Hence, because computer software can exist separate and apart from the tangible tapes and disks, it differs from the seismic information and should be characterized as intangible property.

<u>V.  Majority Misreads Statement in Committee Reports</u>

The majority, as well as the court in <u>Comshare, Inc. v. United States</u>, <u>supra</u>, relies upon a statement (related to the type of property eligible for the investment tax credit) made in the Senate Finance Committee report that accompanied H.R. 10650 (which became the Revenue Act of 1962) to support their conclusion.  The Senate Finance Committee report states, in pertinent part:

Section 38 property.--

Section 38 property (defined in sec. 48(a)), is the only property (either new or used) which is treated as "qualified investment." Except for the exclusions noted below, all tangible personal property qualifies as section 38 property. Except for buildings and their structural components, real property which is used as an integral part of manufacturing, production or extraction or of furnishing transportation, communications, electrical energy, gas, water or sewage disposal services also qualifies as section 38 property. This is also true of real property (other than buildings and structural components) used for research or storage facilities with respect to any of the above categories. Tangible personal property is not intended to be defined narrowly here, nor to necessarily follow the rules of State law. It is intended that assets accessory to a business such as grocery store counters, printing presses, individual air-conditioning units, etc., even though fixtures under local law, are to qualify for the credit. Similarly, assets of a mechanical nature, even though located outside a building, such as gasoline pumps, are to qualify for the credit. Real property (other than buildings and structural components) which qualifies as integral parts of categories referred to above includes such assets as blast furnaces, oil and gas pipelines, railroad track and signals, and fences used in connection with raising cattle.

S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 703, 722.

As I read the majority opinion, the sole stated reason for holding that the computer software at issue is tangible personal property, qualifying for the investment tax credit, is as follows:

In light of the legislative directive to construe the term "tangible personal property" broadly and "[t]he objective of the investment credit * * * to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic

> potential of the country", S. Rept. 1881, <u>supra</u>, 1962-3 C.B. at 717, we believe that petitioner's acquisition of the operating and applications software without any associated, exclusive, intangible intellectual property rights is precisely the type of investment Congress intended to encourage in enacting the ITC. * * * [Majority op. p. 28.]

The majority, as well as the court in <u>Comshare</u>, have expanded the Senate Finance Committee's statement "Tangible personal property is not intended to be defined narrowly here" in a manner I believe not intended by Congress. Both the majority and the court in <u>Comshare</u> have taken the Senate Finance Committee's statement out of the context in which the Senate Finance Committee carefully placed it. Unlike the majority and the court in <u>Comshare</u>, I am unable to conclude that when enacting the investment tax credit provisions Congress contemplated a situation in which property containing both tangible and intangible qualities (such as computer software) qualifies for the credit, or that the investment tax credit was intended to cover property whose value derives substantially from its intangible components. In my opinion, the committee report statement "Tangible personal property is not intended to be defined narrowly here" has reference in relationship to fixtures, components, or other items which under State law would be characterized as real property. The majority has in effect conceded as much in note 9. Although the majority may be correct that the context of the Senate Finance Committee statement does "not foreclose a broad interpretation of the adjective 'tangible'",

majority op. note 9, it is also correct that the context shows that the Senate Finance Committee report does not require the "broad interpretation" that the majority and the court in Comshare give to the term "tangible". Further, to me, it is clear from other parts of the Senate Finance Committee and the Committee of Conference reports that Congress intended a distinction between tangible and intangible property by declaring that "Intangible property, such as patents and copyrights, does not qualify as section 38 property." S. Rept. 1881, supra, 1962-3 C.B. at 858; H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 402, 516.

Thus, the legislative history does not clarify the narrow problem we deal with herein.

VI. Majority Sets Forth No Test or Standard To Determine the Characterization of Property That Has Both Intangible and Tangible Aspects

The majority's holding destabilizes existing law without substituting or improving the intrinsic value test with a coherent standard to fill the vacuum. Further, the majority finds fault with the court's interpretation in Comshare, Inc. v. United States, 27 F.3d 1142 (6th Cir. 1994), of the tangibility test by stating:

> By focusing on whether a taxpayer's investment can be put to productive use in the absence of the tangible medium, the Sixth Circuit's approach would conceivably characterize both the information underlying a complex patent that could only be conveyed to and used by a purchaser if embodied in some tangible medium and the associated intellectual property rights of that patent as tangible personal property for purposes of the ITC. Arguably, however, that result would be different under

> the Sixth Circuit's test if the Government could prove that the information underlying the complex patent could be transferred via electronic transmission over telephone lines and that the purchaser could use the information in that form without receiving a disk, tape, or document. We believe that the characterization of property for purposes of the ITC should not depend on the capacity or reliability of "'affordable communications technology'" at the time of transfer. Cf. Comshare, Inc. v. United States, supra at 1143-1144 (suggesting the contrary conclusion). [Majority op. pp. 24-25.]

Only in this regard, I agree with the majority.

## VII.  Apply Doctrine of Stare Decisis

To conclude, I would apply the doctrine of stare decisis in this case.  Except for the court in Comshare, no other court has found that computer software is eligible for the investment tax credit and/or accelerated depreciation deduction.  I find no compelling reason in the instant setting to depart from the view that computer software does not qualify for the investment tax credit, especially when because of firmly established jurisprudence taxpayers (other than petitioner) have refrained from claiming an investment tax credit with respect to computer software purchases.

COHEN, CHABOT, GERBER, and LARO, JJ., agree with this dissent.